Filed 5/26/22 In re Scarlett S. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| In re SCARLETT S., a Person Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E076651 |
| Plaintiff and Respondent, | (Super.Ct.No. RIJ1900225) |
| v. | OPINION |
| C.S. et al., | |
| Defendants and Respondents; | |
| SCARLETT S., | |
| Appellant. | |

APPEAL from the Superior Court of Riverside County. Cheryl C. Murphy, Judge. Affirmed with directions.

Matthew I. Thue, under appointment by the Court of Appeal, for Appellant.

Gregory P. Priamos, County Counsel and Julie A. Jarvi, Deputy County Counsel, for Plaintiff and Respondent.

John L. Dodd, under appointment by the Court of Appeal, for Defendant and Respondent, J.A.

Scarlett S., a minor, appeals the trial court order granting her father's Welfare and Institutions Code section 388 petition and extending reunification services for six months. She argues the trial court couldn't extend services for more than two and a half months and extending services was not in her best interests. We conclude the judge did not abuse her discretion by extending services, and therefore affirm.

**I**

**FACTS**

*A. Detention and Petition*

In March 2019, mother, who was 37 weeks pregnant, went to the hospital with abdominal pain and heavy bleeding and reported she had used methamphetamine and heroin that day. She gave birth to Scarlett by caesarian section, and both mother and child tested positive for opiates. Mother also tested positive for methamphetamine. She reported Scarlett's father also used drugs.

A social worker visited the parents in the hospital the next day. Father said he and mother had been in a relationship for about a year but weren't married. He said each lived with their own families, but he sometimes stayed with mother at her mother's home and planned to move in with her there.

Father said he had worked at his family's furniture business for 12 years, most recently managing the warehouse. He had prior drug possession charges and had served

about two months at a rehabilitation center in early 2019. He learned mother was pregnant with Scarlett when he was released from the rehabilitation center. He said he was excited about becoming a father and realized he "needed to return to work and be on the 'straight and narrow.'" Nevertheless, he admitted recent heroin and methamphetamine use.

Father said he began using drugs in 2014 after suffering a back injury. He said he started with Norco or Hydrocodone but turned to other drugs. He also admitted using heroin and methamphetamine with mother the day before. He said mother had begun methadone treatment. Mother said she had a history of mental health problems and a history of substance abuse that began when she suffered a gymnastics injury at age eight and started taking pain medications.

The maternal grandmother told the social worker mother had a bedroom in her home, and she had another bedroom that could be used as a nursery. She said father didn't live with them and she hadn't met him before the delivery. Mother had been to several rehabilitation facilities. She had been prescribed Norco to treat gymnastics injuries and migraines. The maternal grandmother said mother had been diagnosed with Turrets Syndrome, ADHD, and bipolar disorder as a child. She said she had recently reported mother to law enforcement after she took money from her bank accounts, she believed to buy drugs. She said she wanted to provide a home for her granddaughter and would arrange for a nanny.

On April 2, 2019, mother and Scarlett were discharged and went home with the grandmother. The parents went to drug test the next day. Father admitted using heroin and he tested positive for amphetamine, methamphetamine, codeine morphine, and acetyl morphine. Mother tested positive for amphetamine, methamphetamine, morphine, and acetyl morphine. Both parents continued to use drugs, though they insisted they didn't use in the child's presence and assured she had care from other people when they used. The social worker notified them the Department of Public Social Services (department) would request removal of the child.

On April 30, 2019, the department filed a petition alleging Scarlett came within Welfare and Institutions Code section 300, subdivision (b)(1) (unlabeled statutory citations refer to this code) because mother had failed to obtain prenatal care and had an extensive unresolved substance abuse history, mental health issues, and a criminal history. They also alleged father knew of mother's problems and had his own substance abuse problem and criminal history.

On May 1, 2019, both parents appeared and were appointed counsel. Father's counsel informed the juvenile court judge, Riverside County Superior Court Judge Cheryl Murphy, that he had straightened out his medical coverage so he could enter a drug treatment program. He also represented that Scarlett's paternal grandparents were available for placement. The judge found a prima facie case the child came within section 300 and ordered her detained from her parents. She ordered the child be placed in foster care and ordered supervised visits at least twice weekly.

*B. Jurisdiction and Disposition*

On May 15, 2019, father admitted continuing to use heroin and methamphetamine. He reported he had attended junior college but said he didn't complete his program. He said he was unemployed but had held a variety of jobs in the past. Both parents were considering in-patient drug programs. They reported living with Scarlett's maternal grandmother, so placement with her wasn't possible and the child remained in foster care.

On July 1, 2019, father appeared at a contested hearing. The department filed an amended petition. Father offered no affirmative evidence, and his counsel explained he was still trying to get into a drug treatment program. The judge found father to be the minor's presumed father. She found the allegations in the amended petition true and the department had made reasonable efforts to prevent removal and ordered Scarlett removed from parental custody.

The judge ordered the department to provide reunification services for both parents and informed them if they failed to participate regularly and make substantive progress in their treatment programs their reunification services could be terminated at the six-month review hearing, which could result in the termination of their parental rights. The judge set the six-month review hearing for January 7, 2020.

*C. The Six-Month Reunification Period*

Before the six-month review, the department recommended terminating reunification services and setting a section 366.26 hearing. Scarlett remained in the same foster home where she had been since May 1, 2019. However, the foster family were not

willing to adopt her.

Mother still lived with the maternal grandmother. However, father had been incarcerated after an arrest the previous September for inflicting corporal injury on a spouse, possessing a controlled substance and paraphernalia, and committing petty theft. He planned to move in with his parents after his release on January 31, 2020. The department wrote to father to advise him to seek out parenting classes and drug treatment in jail, but he said the jail didn't respond. After being released, he reported working at his parents' furniture company and asked for information to assist him in getting into a substance abuse program.

On February 18, 2020, both parents appeared for a hearing. Father's counsel represented father had been released two weeks before the hearing, had completed a correspondence parenting class while in jail, and had enrolled in a program through Riverside University Health System Behavioral Health on his release. He argued the father hadn't had reasonable access to reunification services during his incarceration. The judge found the parents did not avail themselves of the services that were offered to them. She noted father had completed a parenting program while in jail but emphasized he hadn't completed any other services.

The judge recognized the parents had been honest about their relapses and encouraged them to seek treatment. "The Court certainly commends the parents for being honest on their relapse. I think that's first and foremost important factor in terms of being on your way to sobriety. The Court does hope that the parents continue to be in services,

because there's an avenue for parents to return to court on what is called a JV180 or a 388 petition to request change, if there has, in fact, been a change of circumstances." However, by that point the judge found "both mother and father failed to participate regularly and make substantive progress in a court-ordered treatment plan, and there is no substantial probability of return if given another six months of services." The judge terminated reunification services and set a section 366.26 hearing for June 17, 2020.

*D. Father's Treatment and Section 388 Petition*

On February 24, 2020, the department placed Scarlet in a matched adoptive home. On June 5, 2020, the social worker reported father "has not maintained contact with the Department since his release from jail" and "has not provided the Department with any evidence that he is addressing the issues that brought him to the attention of the Department. Mother had visited with Scarlett and participated in programs during the same period.

On June 17, 2020, both parents appeared with counsel for a section 366.26 and section 366.3 postpermanency hearing. Mother substituted in new counsel and father's counsel informed the court father had been in a drug treatment program at the Salvation Army for three months and was sober. The judge continued the hearing to August 14 at mother's request to allow her new counsel to prepare. She also set August 28 for a hearing, if needed, on any section 388 petitions the parents may file.

On July 17, 2020, mother filed a section 388 petition, seeking reinstatement of reunification services. The department continued to recommend the judge terminate

parental rights. However, they noted father had been having positive virtual visits with Scarlett. On August 14, the parties entered a stipulation related to the section 366.3 postpermanency hearing, and the judge set the remaining issues for August 28, 2020. However the judge continued the hearing to October 9 due to mother's counsel's unavailability.

On October 8, 2020, father filed a section 388 petition, requesting an additional six months of reunification services. He reported he had entered a rehabilitation program at the Salvation Army on February 17, 2020. He said he had participated in counseling, had been drug tested daily, and completed all individual and group assignments. The six-month program included counseling, a 12-step program, assistance from a sponsor, and participation in an anger management program.

The next day, father appeared for the hearing and the department requested the judge deny both parents' section 388 petitions. Father's counsel emphasized father had been in an intensive drug treatment program for six months and asked the judge to order the department to file a formal response to his section 388 petition. The judge found father's petition established a prima facie case for finding changed circumstances and set an evidentiary hearing on both parents' petitions for November 10, 2020.

*E. The Section 388 Hearing*

The department maintained their recommendation that the judge deny the section 388 petitions and terminate parental rights. The social worker reported mother was attending a substance abuse program, but her performance was incomplete and she missed

numerous drug tests. The department commended father's efforts at rehabilitation, but relied on his past drug abuse history as a basis to deny the petition. They reported father had completed the Salvation Army program on October 21, 2020, participated in three NA/AA meetings a week with a sponsor, and worked for his parents' furniture company. They represented Scarlett was doing well in her placement and father was participating in appropriate online visits.

On November 10, 2020, the judge continued the hearing to December 30 so she could review drug test results. The department submitted another report, again recommending the judge deny the petitions and terminate parental rights. They said mother had not completed her substance abuse program and was not drug testing. They said father's aftercare program was put on hold because of COVID, but he continued to attend online NA/AA meetings and stayed in contact with his sponsor as well as the three people he was sponsoring. Father had returned negative on-demand drug tests but had been confused concerning the process on some testing dates. The department reported he was attentive during an in-person visit with Scarlett, and the child became more interactive and at ease in successive visits, and they appeared to enjoy each other's company.

On December 30, 2020, the court continued the hearing to February 16, 2021, because the social worker and her supervisor were unavailable to testify, despite being ordered to appear.

The department continued to recommend the judge deny the petitions and terminate parental rights. They reported father continued to work in his parents' furniture store and was complying with his probation terms. His drug tests were negative. They said the child appeared to be very happy to see her father, even crying when he left the room and running out after him and jumping into his arms. The social worker reported being surprised by this reaction because Scarlett is normally very shy. She wanted father's attention and hugs throughout the visit. Scarlett was "very interactive with her father, preferring to sit on his lap while they interact," and wanting him to pick her up. She was "at ease in her interactions with the father," who complied with all visiting rules.

On February 16, 2021, both parents appeared in court for a hearing on their petitions. Father represented he continued to reside in Murrieta with his parents, working full-time in their furniture company. He said he planned to gain additional sales experience and return to school for a business degree and study interior design. He admitted to his substance abuse problem and said he had benefitted from the Salvation Army program, learning coping skills, and "tools just to help me get back on track." He said he had been sober for 11 months, had a sponsor and was on the ninth step of his 12-step program. He also had benefitted from anger management classes.

Father explained he had some problems finding drug testing sites because one facility had stopped providing tests through the department and others had closed because the people working there had contracted COVID. However, he said he had not tested positive while at the Salvation Army, and had a negative hair follicle test and several

other negative drug tests since leaving the program. He said he was willing to engage in additional services if the court extended reunification services for six months. He said he continued participating in NA and domestic violence classes. He reported that visits with Scarlett went well and that Scarlett "genuinely seems disappointed" when the visits end. He was only permitted twice monthly visits but wanted more time with his daughter. He said he had family support from his mother and father, and there was room for Scarlett to be placed in their home with him.

Social worker Pena also testified. She had been assigned to the case in June 2020, after services had been terminated. She testified Scarlet was attached to her caregiver. She said father had been visiting consistently the last six months, but she had observed only one of those visits herself. She had no negative reports concerning the visits.

Pena agreed father's completion of the Salvation Army program was satisfactory, and he had not had a positive drug test since then, including hair follicle tests. She agreed father could show he could maintain sobriety for an additional six months, which would take him to 20 months total. However, she said she believed granting father's petition wasn't in the child's best interest because she had been in foster care for 18 months, mother continued to use drugs, and father had missed four drug test appointments.

The foster mother testified Scarlett had been with her for almost a year, since February 24, 2020, and reported she called her "mama." She said Scarlett cried before visits. She reported they were extremely attached to each other.

F. *The Juvenile Court Judge's Ruling*

The judge noted the case had begun because of the parents' drug use and said they hadn't progressed enough by the six-month review hearing to warrant continuing reunification services.

The judge found father had not had the opportunity to engage in services at the beginning of the case because of his incarceration and noted father had been proactive in seeking services after his release and had always been cooperative with the social worker. She found father a credible witness and found he had successfully completed the Salvation Army drug treatment program. She found father to be "an individual . . . [who] has put forth effort, has basically done everything that has been requested of him" and concluded father had shown a change of circumstances and that it was in the child's best interest to provide him with another six months of services.

The judge granted father's section 388 petition, ordered an additional six months of reunification services, took the section 366.26 hearing off calendar, and set a review hearing for August 5, 2021. She also ordered increased father's visits and drug testing.

On February 23, 2021, minor's counsel appealed.

## II

## ANALYSIS

A. *Best Interests of the Child*

Scarlett argues the trial court erred by granting father's section 388 petition because "[n]o evidence showed that the minor's interest would be served by delaying her

permanent placement in favor of an effort to reunify her" with her father, a person she says she "barely knew."

Section 388 allows a parent to petition a juvenile court to change, modify, or set aside any order previously made by the court. (§ 388, subd. (a)(1); *In re Stephanie M.* (1994) 7 Cal.4th 295, 317.) The parent must present evidence of showing changed circumstances and how, in light of those changed circumstances, the requested order modification will serve the dependent minor's best interests. (*In re Stephanie M.*, *supra*, 7 Cal.4th at p. 317.) "[S]ection 388 plays a vital role in preserving due process in dependency proceedings overall" because "it is only when read in conjunction with the escape mechanism section 388 procedures create that the limited options available at a selection and implementation hearing under section 366.26 comply with due process. Thus, that section 388 provides such an escape mechanism in practice, not just in theory, is vital to the constitutionality of our dependency scheme as a whole, and the termination statute, section 366.26, in particular." (*In re J.M.* (2020) 50 Cal.App.5th 833, 847 [cleaned up].)

Here, father petitioned the trial judge to change the order terminating reunification services after six months and setting a section 366.26 hearing. This is an unusual case in that father made a convincing showing that he had changed his circumstances through extraordinary efforts to free himself of narcotics and get his life back on track. By the time he filed his petition, he had completed a six-month in-patient drug treatment program. By the time the court held a hearing on the issue, after several continuances

requested by mother, the department, and the judge, he had been sober for 11 months, continued to attend NA meetings, returned negative drug tests, had returned to work, and had plans to go back to school. While drug addiction is stubborn, father's success stands out compared with the general run of such cases. (Cf. *In re Kimberly F.* (1997) 56 Cal.App.4th 519, 531, fn. 9 ["It is the nature of addiction that one must be 'clean' for a much longer period than 120 days to show real reform"].) Indeed, Scarlett does not argue the trial court erred by finding father had changed his circumstances. Instead, her appeal turns entirely on whether the trial judge abused her discretion when she determined giving father another chance at reunification was in Scarlett's best interests.

Scarlett argues no evidence supports the finding and points to evidence that would support a contrary finding. Most importantly, she says her prospective adoptive parents had been taking care of her for almost a year and that they had a strong bond. However, it's important to emphasize on appeal we don't "reweigh[] the evidence and substitute[] [our] judgment for that of the juvenile court." (*In re Stephanie M.*, *supra*, 7 Cal.4th at p. 319.) Instead, we review the trial judge's decision for abuse of discretion, overturning the order only if it is arbitrary or without evidentiary support. (*Id*. at p. 318.) Where there is conflicting evidence, we reverse only if the evidence compels a finding for the appellant as a matter of law. (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1527-1529.)

Many factors are relevant to determining the best interests of the child in ruling on a section 388 petition. Among those are "(1) [T]he seriousness of the problem which led to the dependency, and the reason for any continuation of that problem; (2) the strength

of the relative bonds between the dependent children to *both* parent and caretakers; and (3) the degree to which the problem may be easily removed or ameliorated, and the degree to which it actually has been." (*In re Kimberly F.*, *supra*, 56 Cal.App.4th at p. 532.)

Here, in addition to the evidence that Scarlett had bonded with her caretakers, there was evidence she had bonded with her father. Scarlett "appeared to be very happy to see her father" at visits, even crying when he left the room then running out after him and jumping into his arms. She wanted father's attention and hugs throughout their visits. She was "very interactive with her father, preferring to sit on his lap while they interact," and wanting him to pick her up, and she was "at ease in her interactions with the father."

In addition, while drug addiction is a stubborn and serious problem, father's efforts at addressing them were exemplary and suggested he had actually ameliorated the problem. This is not a case where father failed to take steps to address his addiction for 18 months and then did so at the last moment, when hope for reunification were all but dashed. Father did fail to address his addiction initially, but only for the first six-month review period. When the court then terminated services, he very quickly checked himself into a drug treatment program at the Salvation Army, where he remained for six months. The one-year delay until the court held a hearing on father's section 388 petition had little to do with father's conduct, but he did take full advantage of the delay by getting off drugs, staying off drugs, and gaining full-time employment.

As a result, we must conclude there was a substantial basis for the trial judge to conclude granting father another chance at reunification with Scarlett was in the child's best interest. At minimum, the decision was not arbitrary, and we therefore cannot conclude the judge abused her discretion.

B. *Granting Six More Months of Reunification Services*

Scarlett argues the trial judge could not extend services another six months on February 16, 2021, because doing so would extend services beyond 24 months after Scarlett was placed in foster care on May 1, 2019. She argues the court could at most order reunifications services until May 1, 2021.

As Scarlett points out, reunification services are limited in duration. For a child under three years of age, "services shall be provided for a period of 6 months from the dispositional hearing . . . but no longer than 12 months from the date the child entered foster care . . . unless the child is returned to the home of the parent or guardian." (§ 361.5, subd. (a)(1)(B).) "If the time period in which the court-ordered services were provided has met or exceeded the time period set forth" in these provisions, and the "child is not returned to the custody of a parent or legal guardian at the permanency hearing," the judge must either continue the case for up to six months for a permanency review hearing within 18 months of removal or order a section 366.26 hearing be held within 120 days. (§ 366.21, subd. (g)(1)-(4).)

Despite these restrictions, a judge may extend services up to 18 months from removal if "there is a substantial probability that the child will be returned to the physical

custody of the child's parent or guardian within the extended time period or that reasonable services have not been provided to the parent or guardian." (§ 361.5, subd. (a)(3)(A).) And a judge may extend services up to 24 months if "it is in the child's best interest to have the time period extended and that there is a substantial probability that the child will be returned to the physical custody of the child's parent or guardian . . . within the extended time period, or that reasonable services have not been provided to the parent or guardian." (§ 361.5, subd. (a)(4)(A).)

Scarlett argues the trial judge's order inappropriately extended services beyond the 24-month window to August 5, 2021. We decline to reverse on this basis. First, the trial judge had *authority* to rule on the changed circumstances petition and order additional reunification services. The minor does not contest that, but objects to the length of time the order extended services. Second, to the extent there is a problem with ordering services past May 1, 2021, the issue was forfeited by failure of the minor and the department to bring it to the attention of the trial judge. (*Natkin v. California Unemployment Ins. Appeals Bd.* (2013) 219 Cal.App.4th 997, 1011 ['"Appellate courts are loath to reverse a judgment on grounds that the opposing party did not have an opportunity to argue and the trial court did not have an opportunity to consider"'].) In addition, the issue has been mooted by the passage of time. Alerting the trial judge to the potential issue might have given Scarlett a remedy, but nothing we can do in this court would provide a remedy now.[1] (*In re N.S.* (2016) 245 Cal.App.4th 53, 59 ["An appellate

---

[1] Scarlett also argues the trial court was required to consider father's section 388

*[footnote continued on next page]*

court will dismiss an appeal when an event occurs that renders it impossible for the court to grant effective relief”].)

We don’t know whether father successfully completed additional reunification services, cemented his progress in recovery, or suffered a relapse. However, those questions aren’t before us; they are a proper subject of further inquiry in the juvenile court.

## III

## DISPOSITION

We affirm the order extending reunification services and remand to the juvenile court for further proceedings.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

SLOUGH
J.

We concur:

CODRINGTON
Acting P. J.

FIELDS
J.

---

petition under the standard applicable to a request to extend reunification services to 18 or 24 months. Under section 361.5, subdivision (a)(3)(A) and (a)(4)(A), a juvenile court may extend reunification services beyond 12 or 18 months only on a finding that there was a substantial probability that the child would be returned to the parent within the reunification period, or that reinstated services would serve the minor’s best interests. Those provisions aren’t relevant here because father is petitioning for a change of the order terminating his services after the six-month review hearing. In any event, neither the department nor the minor raised this argument in the juvenile court.